IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MARTIN MALDONADO,<br><br>Defendant. | Criminal Action No.<br><br>1:19-CR-076-LMM-CCB |

### Government's Sentencing Memorandum
### For Martin Maldonado

The United States of America, by Kurt R. Erskine, United States Attorney, and Alison B. Prout, Assistant United States Attorneys for the Northern District of Georgia, files this Memorandum in preparation for the sentencing of Defendant Martin Maldonado, recommending a mid-range guidelines sentence.

**I.     PROCEDURAL BACKGROUND**

On August 26, 2019, Defendant Martin Maldonado ("Maldonado") was charged, along with 19 co-defendants, in a 35-count Second Superseding Indictment alleging a multi-month drug trafficking conspiracy.  Doc. 393.  Maldonado was charged in Count One with conspiracy to possess with intent to distribute controlled substances, pursuant to 21 U.S.C. §§ 846 & 841(b)(1)(A), and in Count Six with aiding and abetting in the possession with the intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).  On April 26, 2021, Maldonado pled guilty to Count One.  Doc. 988.  Pursuant to 21 U.S.C.

§ 851, Maldonado faces a 15-year mandatory minimum sentence because he was convicted of the instant offense after his conviction for trafficking in cocaine, a serious drug felony for which he served more than 12 months of imprisonment and for which he was serving a term of imprisonment related to the offense within 15 years of the commencement of the instant offense.

Maldonado raised three guidelines objections to the Presentence Investigation Report ("PSR"), disputing the application of the firearm enhancement, the enhancement for credible threats of violence, and the enhancement for his aggravating role in an offense that involved five or more participants. After conferring with defense counsel about these objections, defense counsel informed the government verbally and in writing and that Maldonado intends to withdraw each of his objections to the PSR. Accordingly the government focuses this memorandum on the relevant sentencing factors of 18 U.S.C. § 3553(a).

## II.    FACTUAL BACKGROUND

*Overview of the Drug Trafficking Conspiracy*

Maldonado was part of a prolific and organized drug trafficking and money laundering organization ("DTMLO") operating in the Atlanta area and surrounding regions. From approximately November 2018 through February 2019, DEA agents intercepted 10 different telephones used by members of the conspiracy. During this time, the government learned that multiple inmates in Georgia prisons were involved in a conspiracy to distribute drugs in the Atlanta area, using contraband cell phones to broker the deals. *See* PSR ¶¶ 37-41. These prison "brokers"

coordinated with unincarcerated DTMLO members who were responsible for retrieving, storing, hiding, packaging and distributing the drugs, as well as collecting and managing the money received in payment, and routing that money back to the drug suppliers, and others receiving cuts of the profits.  *Id*. ¶¶ 42-59.

The DTMLO was prolific.  The prison brokers made literally hundreds of calls and texts *daily* to broker drug deals and direct other members of the organization.  During the 12-week period when the DEA's wiretap investigation was most active (from November 14, 2018 through February 7, 2018), agents made 11 drug seizures totaling more than 100 kilograms of methamphetamine, in addition to 25 gallons of liquid methamphetamine, 15 kilograms of marijuana, more than 10,000 fentanyl pills, 2 kilograms of fentanyl powder and 2 kilograms of heroin.  Wiretap evidence revealed that during that same 12-week period, the DTMLO trafficked far more than those seized quantities. Moreover, the organization's activities were not limited to that 12-week period; conspirators were trafficking drugs by at least August 2018, but likely even before that.

*Maldonado's Role*

Maldonado, who was incarcerated at Washington State Prison in Davisboro, Georgia during the conspiracy, was a broker for the DTMLO who was responsible for setting up drug deals.  PSR ¶ 41.[1]  In November 2018, wire intercepts of the

---

[1] Maldonado asserted an objection to Paragraph 41 and multiple other paragraphs in the PSR.  These objections appear to be directed at the resulting guidelines enhancements rather than the factual statements.  Nonetheless, as previously stated, the government understand that Maldonado intends to withdraw

contraband cell phone used by prison broker and co-defendant Juan Torres Chavez alerted the DEA to the impending sale of four "pantalones" to one of Maldonado's customers.  *Id.* ¶ 127.  The DTMLO used the word "pantalones" as a code word for kilograms of methamphetamine.  *Id.* ¶ 116, n.5.  Torres Chavez relayed to his unincarcerated general, co-defendant Benjamin Villareal Perez, that Maldonado had asked to borrow one of the guns, and that they needed to show that they had weapons because this was the first time they had dealt with this drug buyer.  *Id.*  Villareal Perez reassured Torres Chavez that they practically had a gun store in the stash house.  *Id.*

At the stated time for the transaction, agent observed Maldonado's buyer, later identified as co-defendant Shelly Class, arrive at the stash house, pick up a white plastic bag, and drive off.  PSR ¶ 129.  Agents were unable to intercept Class leaving the residence.  Accordingly, four kilograms of methamphetamine were attributed to Maldonado at the least restrictive conversion factor (*i.e.*, assuming the lowest purity level).  *Id.* ¶ 131.  This is a conservative assumption since virtually all of the methamphetamine seized from this DTMLO was well over 80% pure.

After the transaction, agents intercepted Torres Chavez speaking to Maldonado.  Torres Chavez told Maldonado that the drug buyer had arrived armed, and that if this occurred again, Torres Chavez's people would kill the individual.  PSR ¶ 130.

---

all of his objections.  If that is not the case, the government will call a witness from the DEA to establish the disputed facts.

The following day, Torres Chavez contacted Maldonado to discuss money Maldonado owed. PSR ¶ 132. Maldonado explained that he had already tried to collect the money from the person who owed the debt, and Torres Chavez responded that if the individual did not respond, the individual would be kidnapped. *Id*. Torres Chavez and Maldonado discussed how to deal with the individual who owed the debt (later determined to be Shelly Class) and developed a plan to "grab her" at a gas station during a pretextual drug deal. *Id*. ¶ 144. As part of the plan, an unincarcerated associate of Maldonado would obtain a firearm from unincarcerated associates of Torres Chavez. *Id*. On December 2, 2018, additional text messages and telephone calls revealed that Maldonado directed an individual to travel to Old White Mill to obtain a gun to kill Class. *Id*. ¶ 145. Maldonado also directed the individual to lure Class to the BP gas station off of Roosevelt Highway, and detailed the plan to have associates attempt to kidnap her at the gas station or travel to her residence to kill her. *Id*. Co-defendant and courier Samantha Fagundes was directed to scout out locations on a deserted road to dump the body. *Id*. ¶ 144.

In light of what agents believed to be an imminent and credible threat to life, the government applied for and obtained emergency authorization to intercept Maldonado's contraband cell phone. PSR ¶ 146. (Previous intercepts been obtained from wiretaps on others' phones.) This emergency process involved obtaining the sign-off of the Deputy Attorney General for the United States. Agents were then able to determine Class's identity and rushed to warn her away.

In response, Class texted Maldonado, "Well the Dea just showed up to let me know that there was a hit on my life. Fuck you and your bullshit." *Id*. ¶ 150. After a series of additional messages, Maldonado texted Class, ""Fuck you bitch. Yea and going to get you to the ground. Where you belong." *Id*. He also told an associate that he would "ruin her, make her pieces." *Id*.

During the brief period of time that agents intercepted Maldonado's phone, they also learned of threats that Maldonado made to two other individuals based on purported drug debts. In one case, Maldonado warned an individual, "I put a green light to your brother in prison." PSR ¶ 151. In both instances, agents took steps to warn the appropriate people, and fortunately, nobody was injured in connection with any of Maldonado's threats. *Id*. ¶ 153.

### III.   SENTENCING RECOMMENDATION

The district court should begin all sentencing proceedings by correctly calculating the advisory Guidelines range. *Gall v. United States*, 552 U.S. 38, (2007). While the Guidelines are significant factors in the Court's sentencing decision, the Court must ultimately determine a reasonable sentence based on the factors set forth in 18 U.S.C. § 3553(a). *United States v. Pugh*, 515 F.3d 1179, 1188 (11th Cir. 2008). Here, if the Court applies the enhancements recommended by probation, Maldonado's guidelines are 235 to 293 months, and the government is recommending a hig-end guidelines sentence.

Congress provided, through 18 U.S.C. § 3553(a), the factors to be considered by district courts in imposing a "sentence sufficient, but not greater than necessary,

to comply with" the basic aims of sentencing, which include: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense and to promote respect for the law; (3) the need for adequate deterrence; (4) the need to protect the public; (5) the need to provide the defendant with educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Guidelines range; (8) the pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(a)(1)-(7).  The most relevant Section 3553(a) factors in Maldonado's case are set forth below.

### 1. The Nature and Circumstances of the Offense, 18 U.S.C. § 3553(a)(1)

The nature and circumstances of Maldonado's offense stand apart from most of his co-defendants.  Not only did Maldonado brazenly traffic dangerous drugs from prison while serving a sentence for drug trafficking, he also plotted the kidnapping and murder of a drug associate on the (apparently mistaken) belief that the associate owed him a drug debt.  The plot was specific in both time and detail, and involved tasking identified conspirators with defined roles in the plot.  The plot was also disturbingly violent, involving instructions about how to approach Class's vehicle at the gas station and how to conceal and dispose of her body.  Moreover, in the span of days, Maldonado threatened the lives of at least two other individuals.  Based on this small snapshot of behavior, there is no telling how

much other attempted or actual violence Maldonado succeeded in causing during periods when his contraband cell phone was not being monitored.

Moreover, Maldonado acted as a manager or supervisor within the extensive DTMLO. He coordinated drug transactions, directing Shelly Class and possibly others to act as his couriers. Samantha Fagundes was enlisted to assist in the abduction of Class. Maldonado's murder scheme also involved Torres Chavez, who was second only to Jesus Sanchez-Morales in the organization, and Villareal Perez, who was the leader of the unincarcerated branch of the organization.

Finally, Maldonado's sentencing guidelines under-represent the total quantity of drugs that he was trafficking. The undisputed drug quantity attributed to Maldonado in the PSR, between 1.5 and 4.5 kilograms of methamphetamine, is based on one specific transaction in which agents were unable to seize and test the methamphetamine, and thus the lowest purity level possible was assumed. But the substantial quantities of methamphetamine seized from the DTMLO at other times indicates that it was trafficking very pure methamphetamine. Moreover, law enforcement could not be everywhere at all times, and it is clear from the investigation that Maldonado was involved with trafficking additional illegal drugs that law enforcement could not intercept. In other words, the drug quantity attributed to Maldonado, resulting in a base offense level of 32, is a conservative measure of the extent of his involvement in the DTMLO. While the Government does not request an upward departure, the likely understatement of the drug

quantity used to determine Maldonado's sentencing guidelines does weigh in favor of a mid-range guidelines sentence.

### 2. The History and Characteristics of the Defendant, 18 U.S.C. § 3553(a)(1)

In 2010, at age 27, Maldonado was convicted after a trial of trafficking in cocaine as a result of his attempt to transport multiple bricks of cocaine in his vehicle. PSR ¶ 289. Despite this apparently being his first offense, he was sentenced to 30 years in prison. *Id*. While in prison, Maldonado did not change paths. Instead, he illicitly obtained cell phones and used them continue his occupation in the drug trade. Wire intercepts demonstrated that that the transaction involving Class was not an isolated incident. Rather, Maldonado was maintaining an active business of brokering drug transactions and directing the use of firearms and violence while in prison.

### 3. The Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)

The need for both specific and general deterrence are paramount here. With regard to specific deterrence, Maldonado has shown that a large prison sentence did not rehabilitate him or cause him to choose a new direction for his life. He has also shown that even incarceration itself will not deter him from committing dangerous crimes in the community. Allowing Maldonado to reenter society could pave the way for exponentially more violence. Accordingly, a significant sentence in a secure facility is needed to protect the public. With regard to general

deterrence, it is critical that inmates serving long prison sentences understand that they will face additive and serious consequences if they persist in breaking the law.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence Maldonado to a mid-range guidelines sentence. Such a sentence is sufficient, but not greater than necessary, to comply with considerations of 18 U.S.C. § 3553(a).

This 4th day of January, 2022.

Respectfully submitted,

KURT R. ERSKINE
*United States Attorney*

/S/ ALISON B. PROUT
*Assistant United States Attorney*
Georgia Bar No. 141666
alison.prout@usdoj.gov

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

## Certificate of Service

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

        Stephen M. Reba

January 4, 2022

            /s/ ALISON B. PROUT
            ALISON B. PROUT
            *Assistant United States Attorney*